Filed Feb. 14, 1894.

---

No. 1,057.

THE TOLEDO, ST. LOUIS AND KANSAS CITY RAILROAD COMPANY v. CUPP.

RAILROAD.—*Duty to Fence.*—*Exemption from.*—*Burden of Proof.*—*Addition to a City.*—*Law and Fact.*—The fact that a railroad passes through an addition to a city, which is laid out, platted and divided into lots and streets and alleys, does not of itself absolve the company from the duty of securely fencing in its track; for wherever a railroad company can build and maintain a fence to inclose its track without interfering with the rights of the public, or with the free use of private property, or of its own property, then it is bound to maintain a fence. And the burden of showing that a railroad company is not required to fence its track at a given point, rests upon the railroad company. Where a fence or a cattle-guard would make company's track and right of way dangerous to its employes in a high degree, or to a considerable degree, exemption from fencing might be ruled as a matter of law, but such question is usually a mixed question of law and fact.

From the Adams Circuit Court.

*S. O. Bayless, C. G. Guenther* and *C. Brown,* for appellant.

*E. R. Wilson* and *J. J. Todd,* for appellee.

The Toledo, St. Louis and Kansas City Railroad Company *v.* Cupp.

LOTZ, J.—The appellee's horses entered upon the appellant's railroad track at a point where it was not fenced, and were killed by the engine and cars. This action was brought to recover their value.

The cause was put at issue by the general denial, tried by the court, which, at the instance of the appellant, made a special finding of the facts, stated conclusions of law, and rendered judgment against the appellant.

The only question in controversy is whether or not the appellant was required by law to fence its track at the point where the horses entered upon it.

From the facts as found by the court, it appears that the horses entered upon the track at a point within the corporate limits of the city of Bluffton, Indiana, and within a subdivision thereof known as Burwell and Hall's addition to said city, which addition was at the time laid out and platted into lots, streets, and alleys, said lots being of various sizes and the streets being fifty feet wide, and the alleys twelve and twenty-five feet wide. Said addition lies immediately west of the Wabash river, and that portion of it through which the appellant's railroad passed, was unoccupied by houses, and the streets and alleys were unimproved, and the said portion was unenclosed and lay out in a common, at the time the horses were killed. At the east side of said addition, appellant's main track crosses the Wabash river on a bridge. On the west side of said addition, appellant's main track is crossed by the main track of the Lake Erie and Western Railroad. The distance from the bridge west to the point where said railroads cross each other is 1,000 feet. Three hundred and fifty feet west from the crossing a switch starts from appellant's main track, and extends westward; and all the switches, side tracks, and spurs of appellant's railroad in said city were then west of said crossing, and there was then no side track,

spur, or switch on the appellant's right of way between said crossing and the river bridge. The grade of the railroad descends slightly from the crossing to the bridge. The horses entered upon the track at a point between lots 20 and 21, not on a street or alley, and between the crossing and the bridge, and were struck by the locomotive and cars and killed near the bridge. No part of the right of way and railroad track between the crossing and bridge was fenced. The loading and unloading of freight cars and the shifting and switching of cars on the appellant's railroad in said city were done west of the said railroad crossing. The main track between said crossing and said "bridge has been used but seldom for that purpose."

"The railroad could be securely fenced and cattle-guards could be constructed on and along the same between said railroad crossing and said river bridge, without interfering with the defendant in the transaction of business on said road, without materially increasing the danger to trainmen, and without materially increasing the liability to collisions and accidents on said part of said railroad."

The length of an ordinary freight train on said road, at that time, was from 1,100 to 1,200 feet.

The fact that appellant's railroad passed through an addition to a city which was laid out, platted, and divided into lots and streets and alleys, did not of itself absolve the railroad company from the duty of securely fencing in its track, for wherever a railroad company can build and maintain a fence to enclose its track without interfering with the rights of the public, or with the free use of private property, or of its own property, then it is bound to maintain the fence, whether it be in the country, in a village, in a town, or in a city. *Ohio, etc., R. W. Co.* v. *Rowland,* 50 Ind. 349 (354); *Wabash,*

R. W. Co. v. *Forshee*, 77 Ind. 158 (163); *Wabash, etc.*, R. W. Co. v. *Tretts*, 96 Ind. 450 (452); *Ohio, etc.*, R. W. Co. v. *Neady*, 5 Ind. App. 328.

The statute in terms requires a railroad company to securely fence its tracks at all points, but the courts have held such requirement unreasonable, and that it was not the legislative intent and purpose to compel the company to fence at all points regardless of its rights and the rights of the public.

The courts have excepted many places from the general terms of the statute. One of these exceptions is where the fencing of the track would endanger the safety of the company's employes. The adjudged cases hold that the company is liable to its servants if it negligently or wrongfully make unsafe and dangerous places in its track.

In *Lake Erie, etc., R. W. Co.* v. *Kneadle*, 94 Ind. 454, it is said: "Its duty with respect to its tracks is much the same as that to which it is held respecting its machinery."

This court, in *Indianapolis, etc., R. W. Co.* v. *Clay*, 4 Ind. App. 282, gave another and more forcible reason why the company should be absolved from building fences or cattle-guards at such places. CRUMPACKER, J., said: "In our opinion higher and more humane reasons exist for the immunity. The law does not require, or even permit, one, in order to protect the property of another, to do a thing in the prosecution of a legitimate business, which will jeopardize the safety of human life or limb. It is a question of humanity rather than of dollars and cents."

Appellant's contention is that the special findings show that the track between the railroad crossing and the bridge was used for switching purposes, and that fences and cattle-guards could not be constructed without jeopardizing the lives and limbs of its employes. The

findings show that this portion of the main track was used "but seldom" for switching purposes.

The burden of showing that a railroad company is not required to fence its track at a given point, rests upon the company; and, where the fencing would probably but slightly increase the danger to trainmen and employes, it can not be said as a proposition of law that the company is relieved from the obligation of fencing.'

"It is only where a prudent man would not incur the risk in order to avoid the consequences at stake, that a railroad company may avail itself of the exemption to fence its road at a particular point on account of the personal perils it might entail." *Toledo, etc., R. R. Co.* v. *Woody*, 5 Ind. App. 331.

Whether or not a railroad company is exempt from fencing its track at any given point is ordinarily a mixed question of law and fact. Where a fence or a cattle-guard would make the company's track and right of way dangerous to its employes in a high, or to a considerable, degree, exemption from fencing might be ruled as a matter of law. But where the danger is only slightly increased, the court or jury trying the case is the proper tribunal to determine between the conflicting duties and to say whether or not a fence should be constructed at a given point. In this case the court found that a fence and cattle-guards could have been constructed at the point where the horses entered upon the track, without interfering with the transaction of the business of the company, and without materially increasing the danger to trainmen or the liability to collisions and accidents.

Under statutes similiar to our own, it has been held in other States, that "When it is fairly debatable under the evidence, whether it was necessary for the railway company to leave unfenced a part of its road near a depot in a town, in order to avoid danger to its employes, and

for the purpose of the safe and convenient transaction of its business with the public, it can not be held as a matter of law that the railway company is relieved from its obligation to fence that part of its road." *Brandenburg* v. *St. Louis, etc., R. R. Co.*, 44 Mo. App. 224.

The appellant further insists that the evidence establishes, without contradiction, that this portion of its track was used for switching purposes daily, and that the finding of the court is not supported by the evidence.

The case of *Cincinnati, etc., R. R. Co.* v. *Wood,* 82 Ind. 593, is cited and relied on to support the proposition that there is no conflict in the testimony. That was an action brought against a railroad company for killing a horse. The company there, as here, claimed that it was not required to fence its track at the point where the horse entered upon it. Several witnesses for the plaintiff testified that no business was transacted by the company at the point where the horse entered, except to run its locomotives and trains over its main track; that cars were neither loaded nor unloaded at that point by persons doing business with the company.

These witnesses thus testifying were not in any way engaged in business on the road, or connected with it, or those managing its business. They were but casual observers engaged in other business. A number of witnesses connected with the road and managing its business,—loading and unloading freight, making up trains, coupling and uncoupling cars,—with ample opportunities to know, testified that the grounds were used by persons doing business on the road; that teams, in carrying freight to and from the road, used the grounds, and that cars were often coupled and uncoupled there for switching purposes.

The court held that while the testimony was not seemingly in complete harmony, yet it was not conflicting.

In speaking of the testimony of the plaintiff's witnesses, the court said: ''They should, we think, be understood as testifying that, so far as they had observed or noticed, the grounds * * * had not been used by those in control of the railroad. So understood, their testimony is not in conflict with the testimony introduced by appellant.''

In the case in hearing the civil engineer and the road-master of the appellant, who were familiar with the manner in which the company transacted its business at this point, both testified that the track between the bridge and crossing was used frequently, and often, for switching purposes, and that fences and cattle-guards could not be constructed there without interfering with the business of the road and endangering the lives and limbs of the employes.

Two witnesses for appellee testified that they had never seen any switching done at this point. They were not, in any manner, connected with the business of the road and may be classed as casual observers. Another witness for appellee testified, that he worked on the dray line in Bluffton, and was engaged in hauling freight to and from appellant's cars; that he loaded freight on the cars and handled freight from the cars, and was familiar with the way and place where the cars were handled and the manner and place in which all the switching and making up trains was done; that all such business was done west of the crossing, and that nothing of the kind was done on the track between the crossing and the bridge. The opportunities of this witness to observe the manner and the place in which the appellant transacted its business and did its switching, it occurs to us, was equally as good as the opportunities of appellant's witnesses, and that he was more than a mere casual observer.

In this state of the testimony, we think there was a conflict, and, there being a conflict, under the familiar rule this court must decline to weigh the evidence.

We find no error in the record.

Judgment affirmed, at the costs of appellant.

Filed Feb. 15, 1894.